IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 13, 2019 Session

## EDWARD HARPER v. SHELBY COUNTY SCHOOLS

Appeal from the Chancery Court for Shelby County
No. CH-13-1820     JoeDae L. Jenkins, Chancellor
_____

### No. W2018-01100-COA-R3-CV
_____

This is a case arising out of the Teacher Tenure Act. A tenured middle school teacher sought review of a decision of the board of education upholding his termination for inefficiency, incompetence, and neglect of duty. The chancery court affirmed the board's decision, sustaining the teacher's termination. Teacher appealed to this Court. We reverse the chancery court's findings with respect to neglect of duty. However, we affirm the chancery court's findings with respect to inefficiency and incompetence, and thereby affirm the teacher's termination.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Affirmed in Part, and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Laura E. Smittick and Darrell J. O'Neal, Memphis, Tennessee, for the appellant, Edward Harper.

Yasmin A. Mohammad, Memphis, Tennessee, for the appellee, Shelby County Board of Education.

### OPINION

#### BACKGROUND AND PROCEDURAL HISTORY

Edward Harper was a licensed, full-time teacher with Memphis City Schools— now Shelby County Schools, which, since August 19, 1996, is governed by the Shelby County Board of Education ("SCBE").[1] In July 1999, Mr. Harper was granted tenure.

_____

[1] As a result of the Memphis City School's decision to surrender its charter in 2011, the Memphis City School System merged with the Shelby County School System, effective July 1, 2013.

During his tenure, Mr. Harper was administratively transferred to and from various schools, including Riverview Junior High School, Longview Middle School, Treadwell High School, A. Maceo Walker Middle School, and Cypress Middle School.

SCBE evaluated its teachers with respect to what it refers to as six "domain" areas: Domain I: Planning Indicators; Domain II: Teaching Strategies Indicators; Domain III: Assessment and Evaluation Indicators; Domain IV: Learning Environment Indicators; Domain V: Professional Growth Indicators; and Domain VI: Communication Indicators. Further, the specific scoring standards that accompanied the domain areas are as indicated in the following chart:

| Comprehensive Assessment Process | | |
|---|---|---|
| Current Status | Standard for Advancement | A Domain is Identified as "Required Area to Strengthen" if THERE IS AN "UNSATISFACTORY" RATING IN AT LEAST 1 INDICATOR OR |
| FIRST /SECOND YEAR APPRENTICE TEACHERS | No more than 2 domains be identified as "Required Areas to Strengthen" | ➢ All indicators at Level A or an indicator(s) below Level A in a domain within Domains I-IV ➢ An indicator(s) below Level A in a domain in Domains (V & VI |
| Third Year Apprentice/Advancement to a Professional License | Advancement to Professional License allows no more than 2 domains identified as "Required Areas to Strengthen" | ➢ An indicator(s) below Level B |
| Professional License | No more than 1 domain be identified as a "Required Area to Strengthen" | ➢ An indicator(s) below Level B ➢ A domain in which no indicator is at Level C |

Accordingly, if a teacher held a professional license—as Mr. Harper did at the time of each of the evaluations at issue in this case—then in order to be deemed "satisfactory," that teacher could not have more than one domain marked as required to be strengthened; if more than one domain was so marked, then that teacher's performance should be deemed "unsatisfactory."

During the 2007-2008 school year, Mr. Harper taught at Treadwell High School. Principal Clementine Poole conducted Mr. Harper's evaluation and identified three domain areas that he was required to strengthen: Domain I; Domain IV; and Domain V. Additionally, Mr. Harper's 2007-2008 evaluation indicates that he was tardy 42 times and that he accumulated 6 absences during the school year. According to the Hearing Officer, Mr. Harper's 42 incidents of tardiness accounted for more than 25% of the school days for the 2007-2008 school year. Despite identifying three domain areas in which he was deficient, Ms. Poole nevertheless marked Mr. Harper's evaluation score as "Satisfactory." In an apparent attempt to justify her evaluation, Ms. Poole added the following comment at the end of the evaluation: "Although this educator should only have 1 Domain to strengthen, we deem it essential for him to work on more. In

- 2 -

addition[,] we have changed the Domains as instructed by the district, but we evaluated as we saw it."

During the 2008-2009 school year, Mr. Harper was still teaching at Treadwell High School. Administrator Ronnie Vasser conducted Mr. Harper's evaluation for that school year and identified three domains that he was required to strengthen: Domain I; Domain III; and Domain IV—two of which had been identified the previous year. Despite identifying *three* domain areas, Mr. Vasser recommended Mr. Harper for re-election[2] and marked his evaluation score as "Satisfactory." Additionally, the evaluation reflects that Mr. Harper was tardy 91 times—more than 50% of the school days for the 2008-2009 school year.

Following the 2008-2009 school year, Mr. Harper transferred to A. Maceo Walker Middle School. During the 2009-2010 school year, Principal Tonye McBride observed Mr. Harper's classroom on numerous occasions and noted that he had significant classroom management issues. Specifically, she observed students talking, playing, joking, throwing materials, and not paying attention during Mr. Harper's class.[3] To assist Mr. Harper with his classroom management issues, Principal McBride required Mr. Harper to give a professional development presentation on classroom management to other teachers during an October 2009 in-service training session. Mr. Harper gave the presentation, but, according to Principal McBride, as well as other administrators and teachers, his classroom management issues persisted. In October or November of 2009, Mr. Harper took sick leave and thereafter missed the remainder of the 2009-2010 school year. Although there were issues regarding whether Mr. Harper timely submitted his leave-extension paperwork, SCBE ultimately approved Mr. Harper's sick leave.

Mr. Harper transferred schools again for the 2010-2011 school year. Upon the recommendation of Gina Nicholson, the principal of Cypress Middle School, SCBE hired Mr. Harper to teach eighth grade at her school. Principal Nicholson observed Mr. Harper's classroom on numerous occasions, and she, like Principal McBride at A. Maceo Walker Middle School, noted that Mr. Harper had significant classroom management issues.[4] Principal Nicholson conducted Mr. Harper's evaluation and identified one domain area to strengthen and marked Mr. Harper's evaluation score as "Satisfactory." In order to provide support to Mr. Harper regarding his classroom management issues, Principal Nicholson decided to transfer Mr. Harper from the eighth grade to the sixth grade for the following school year.

---

[2] "Re-election" is a term of art used on SCBE's evaluation forms.

[3] Principal McBride also observed that Mr. Harper's teaching style—lecture-based—was non-engaging to middle school students, which, in her opinion, created some of the classroom management issues.

[4] Specifically, Principal Nicholson observed that Mr. Harper had no control in the classroom and that the students would not respect him.

As a sixth grade teacher at Cypress Middle School, Mr. Harper's classroom management issues persisted. During the 2011-2012 school year, Principal Nicholson and Assistant Principal Antonio Ryan conducted informal "drop-ins" on Mr. Harper's classroom one to three times a week.[5] Mr. Ryan testified that, during these drop-ins, he observed behavior such as students exiting the classroom without permission, yelling at other students, and walking across the desks. In addition to the informal drop-ins, Principal Nicholson and Mr. Ryan separately conducted a total of four formal observations—two announced and two unannounced—of Mr. Harper's classroom, during which they completed Observation Summary reports. In these reports, Mr. Harper was rated on 11 different indicators, such as his explaining the content to his students, checking for students' understanding of the content, and cultivating a learning environment.[6] Principal Nicholson conducted the two announced observations, the first on October 31, 2011 and the second on February 17, 2012. On the October 31, 2011 Observation Summary Report, Mr. Harper was rated "Meeting Expectations" on 2 of the 11 indicators and "Below Expectations" on the other nine. On the February 17, 2012 Observation Summary Report, he was rated "Below Expectations" on 7 of the 11 indicators and "Significantly Below Expectations" on the other four. Mr. Ryan conducted the two unannounced observations, the first on January 1, 2012 and the second on March 6, 2012. On the January 1, 2012 Observation Summary Report, Mr. Harper was rated "Below Expectations" on 8 of the 11 indicators and "Significantly Below Expectations" on the other three. On the March 6, 2012 Observation Summary Report, he was rated "Below Expectations" on 5 of the 11 indicators and "Significantly Below Expectations" on the other six. Following each formal observation, Principal Nicholson or Mr. Ryan—whoever conducted the observation—met with Mr. Harper to jointly complete a post-observation report, the purpose of which was to detail areas of growth and list additional considerations for Mr. Harper. Principal Nicholson and Mr. Ryan completed their post-observation reports with Mr. Harper on November 4, 2011 and February 24, 2012, and January 13, 2012 and April 3, 2012, respectively.

On June 20, 2012, Mr. Harper was notified that tenure charges would be brought against him and that a recommendation of dismissal would be submitted to SCBE pursuant to the Tennessee Teacher Tenure Act (the "Tenure Act"), codified at Tennessee Code Annotated sections 49-5-501, *et seq*. Thereafter, on February 28, 2013, SCBE notified Mr. Harper that the following charges were being brought against him: (1) Incompetence, in violation of Tennessee Code Annotated section 49-5-501(5); (2) Inefficiency, in violation of section 49-5-501(6); and (3) Neglect of Duty, in violation of section 49-5-501(8). Pursuant to section 49-5-512 of the Tenure Act, Mr. Harper requested and was granted an administrative hearing, which was held on June 4-5 and 12,

---

[5] A drop-in is when an observer informally visits a classroom by walking in for a short period of time with as little disruption to the classroom as possible.

[6] The ratings were on a scale from "Significantly Below Expectations" to "Exceeding Expectations."

2013.  On August 12, 2013, the Hearing Officer entered findings of fact and conclusions of law, finding that Mr. Harper was inefficient, incompetent, and had neglected his duties, sustaining the recommendation for his dismissal.  Mr. Harper then appealed the Hearing Officer's ruling to SCBE.  After a hearing, SCBE, on November 14, 2013, sustained the Hearing Officer's decision.  On December 13, 2013, Mr. Harper filed a petition for writ of certiorari in the Shelby County Chancery Court (the "chancery court"), seeking judicial review of his dismissal.

A hearing was held on August 14, 2017, and on January 10, 2018, the chancery court entered its findings of fact and conclusions of law, affirming SCBE's dismissal of Mr. Harper on the basis of inefficiency, incompetency, and neglect of duty.  Mr. Harper filed a motion to alter or amend the chancery court's order, which the chancery court denied on June 6, 2018, stating that there is "no clear error of law or injustice that would entitle Mr. Harper to the relief he seeks" and that "[s]ufficient evidence is found within the Court's Order and the record in its entirety to justify SCBE's dismissal of [Mr. Harper]."  Mr. Harper timely filed his notice of appeal on June 14, 2018.

**ISSUES PRESENTED**

Mr. Harper raises 5 issues on appeal, which we rephrase as follows:

1. Whether the chancery court erred in finding that there was sufficient evidence to support Mr. Harper's dismissal on the basis of inefficiency.
2. Whether the chancery court erred in finding that evaluations plainly marked on their face as "satisfactory" were in fact not satisfactory and were sufficient to support Mr. Harper's dismissal based on inefficiency.
3. Whether the chancery court erred in finding that there was sufficient evidence to support Mr. Harper's dismissal on the basis of incompetency.
4. Whether the chancery court erred in finding that there was sufficient evidence to support Mr. Harper's dismissal on the basis of neglect of duty.
5. Whether the chancery court erred in finding that SCBE provided an individual professional development plan to Mr. Harper as required by MCS Professional Development Policy 5.8034.

**STANDARD OF REVIEW**

As the Tennessee Supreme Court stated in *Emory v. Memphis City Schools Board of Education*,

> it is apparent that the standard of review under the Tenure Act is not the standard applicable to a common law writ of certiorari.  Instead, the standard of review specified in the statute is intended to permit the chancery court to address the intrinsic correctness of the school board's

decision. The appellate court in *Ripley* aptly described this standard of review: "The chancery court's review, as contemplated by [section 49-5-513], is a *de novo* review wherein the chancery court does not attach a presumption of correctness to the school board's findings of fact, nor is it confined to deciding whether the evidence preponderates in favor of the school board's determination." The teacher does not have the ability to present new evidence on the merits of the charges; the chancery court's *de novo* review is limited to the record of the school board proceedings.

*Emory v. Memphis City Schools Bd. of Educ.*, 514 S.W.3d 129, 141-42 (Tenn. 2017) (internal citations omitted). Thus, the chancery court is to review appeals under the Tenure Act pursuant to the standard of review as explained above in *Emory*. If an appeal is taken from the decision of the chancery court to this Court, we review the chancery court's decision pursuant to Rule 13(d). The chancery court's findings of fact are reviewed de novo with a presumption of correctness unless the evidence preponderates otherwise. *Id.* at 142. Issues of law are reviewed de novo, with no presumption of correctness given to the chancery court's conclusions. *Id.*

**DISCUSSION**

The primary purpose of the Tenure Act is "to protect school teachers from arbitrary demotions and dismissals." *Cooper v. Williamson Cty. Bd. of Educ.*, 746 S.W.2d 176, 179 (Tenn. 1987) (quoting *Snell v. Brothers*, 527 S.W.2d 114, 116 (Tenn. 1975)). However, the Tenure Act does provide five exclusive grounds for which a tenured teacher may be dismissed: incompetence, inefficiency, neglect of duty, unprofessional conduct, and insubordination. Tenn. Code Ann. § 49-5-511(a)(2). In the instant case, the chancery court found that Mr. Harper was inefficient, incompetent, and engaged in neglect of duty, ultimately concluding that SCBE had just cause to dismiss Mr. Harper.

**A. Inefficiency**

Tennessee Code Annotated section 49-5-501 defines "inefficiency" as follows:
"Inefficiency" means being below the standards of efficiency maintained by others currently employed by the board for similar work, or habitually tardy, inaccurate or wanting in effective performance of duties. The definition of inefficiency includes, *but is not limited to*, having evaluations demonstrating an overall performance effectiveness level that is "below expectations" or "significantly below expectations" as provided in the evaluation guidelines adopted by the state board of education pursuant to § 49-1-302[.]

Tenn. Code Ann. § 49-5-501(6) (emphasis added). As is apparent from the definition and as this Court has noted, "[t]he definition of inefficiency is not exclusively limited to having poor evaluations[.]" *Harrison v. Shelby Cty. Bd. of Educ.*, No. W2015-01543-COA-R3-CV, 2016 WL 1250782, at *4 (Tenn. Ct. App. Mar. 30, 2016). In the present case, the chancery court found that Mr. Harper's dismissal for inefficiency was warranted because he lacked sufficient classroom management skills. The question, then, becomes whether there is sufficient evidence in the record to support such a finding. We conclude that there is.

Principal McBride testified that, prior to the start of the 2009-2010 school year at A. Maceo Walker, Mr. Harper was "slow" and "nonchalant" about preparing his classroom for the first day of school. She also testified that, during the school year, Mr. Harper had significant classroom management issues. Specifically, Principal McBride testified that

> [t]he kids – the kids were not paying attention, they were talking and chatting, paper all over the classroom, so [Mr. Harper's] up talking or presenting the lesson and the kids are just doing whatever they want to do. And then quite a few times when we walked in, you know, he would begin instruction when the administrator walked into the classroom, so prior to that, we do a lot of monitoring of the halls and we walk classes all the time, but just walked by and the kids are just in complete chaos, I mean just – just doing whatever – whatever 12-year-olds want to do, I mean, talking and playing and joking and checking, yelling across the room, throwing paper balls, just all sorts of juvenile behavior that was occurring within the confines of those four walls.

Mr. Harper's own classroom management issues bled over into subsequent classrooms, as well. Principal McBride testified that "the noise that was coming from his classroom was just interrupting the entire hallway." She further testified that other teachers complained to her that it would take 5 to 10 minutes to control the students in their classrooms who had just come from Mr. Harper's classroom.

Principal Nicholson and Mr. Ryan also observed Mr. Harper's classroom management issues during the 2011-2012 school year at Cypress Middle School. Principal Nicholson summarized Mr. Harper's classroom environment as follows: "Sometimes it looked like busy work that was taking place, students – some of them were up and around playing with each other, some of them were very boisterous. Some of them weren't doing any work, some of them were doing work." Mr. Ryan provided a similar summarization of what he observed in Mr. Harper's classroom: "[T]here were scholars who just got up and walked out of class . . . . There were things, like, walking across desks in the classroom, getting up on the floor without permission in the class,

yelling out, checking to the point where it really discouraged other scholars."[7] According to Mr. Ryan, Mr. Harper "spent a bulk of his class time correcting misbehavior." Mr. Harper even resorted to using a whistle to bring his classroom back to order. As to the effect Mr. Harper's classroom management had on other classrooms, Principal Nicholson testified that multiple teachers expressed their frustrations to her. She recounted that one teacher told her that Mr. Harper's classroom was "total chaos," another that Mr. Harper had "no control over his classroom."

Mr. Harper's lack of classroom management is also reflected in the Observation Summary reports completed by Principal Nicholson and Mr. Ryan following their formal observations of his classroom. In one, dated January 5, 2012, Mr. Ryan reported the following:

> In the observed lesson, there was very little evidence that a positive rapport existed between the teacher and the students as evident in the number of times the teacher had to correct misbehavior, which significantly interfered with the flow of the lesson . . . . Students were frequently disrespectful to the teacher, and, at times, their fellow peers, as evident in the teacher using a whistle in the classroom, students blurting out, students checking/teasing each other, and constant verbal redirection throughout the class.

Two months later, on March 6, 2012, Mr. Ryan completed a similar report:

> The lesson did not progress at an appropriate pace due to the teacher having to constantly address misbehavior in the class. Further, there were a number of students disengaged in the lesson . . . . Students were frequently disrespectful to the teacher and their peers . . . . The teacher had to address the students on many occasions about talking excessively, sharpening pencils, getting up on the floor without permission, and coming to class prepared.

In *Ketchersid v. Rhea County Board of Education*, this Court affirmed the school board's decision to dismiss a tenured teacher on the basis of insubordination, incompetence, and inefficiency. *Ketchersid v. Rhea Cty. Bd. of Educ.*, 174 S.W.3d 163, 164 (Tenn. Ct. App. 2005). In finding sufficient evidence to support a finding of inefficiency, this Court noted the following:

> Assistant Principal Jackson testified before the School Board that, when he had observed Mrs. Ketchersid's classroom prior to her February 12, 2002 suspension, he was forced to call down a child who was misbehaving

---

[7] Mr. Ryan testified that, from his interactions with the students, he learned that "if you want to cut up, [Mr. Harper's is] the class you cut up in."

because Mrs. Ketchersid was doing nothing to control the situation. Jackson stated that he had never had to call down a child before while observing any other classroom. Mrs. Ketchersid even admitted at the hearing that she had failed to appropriately discipline her students and make them behave, in spite of her 24 years of teaching experience.

*Id.* at 169. Similarly, here, the record is replete with instances of Mr. Harper's classroom management issues and his students' misbehavior—issues that, according to multiple school administrators, other teachers did not experience.[8] Moreover, despite his 18 years of teaching experience, multiple school administrators—from two different schools—had described Mr. Harper's classroom as total and complete chaos. We conclude that Mr. Harper's lack of classroom management skills demonstrated a "wanting in effective performance of duties" and was "below the standards of efficiency" when compared to other teachers employed by SCBE. Accordingly, we affirm the chancery court's finding that there is sufficient evidence to sustain Mr. Harper's dismissal on the basis of inefficiency.

The chancery court also found sufficient evidence to sustain Mr. Harper's dismissal on the basis of inefficiency because he scored "below expectations" or "significantly below expectations" on multiple evaluations.[9] While Mr. Harper contends

---

[8] Mr. Ryan provided the following testimony:

> Q: So is it correct to say that the other sixth grade teachers taught the same students that Mr. Harper taught?
> A: Taught the exact same students.
> Q: Okay. And was it – and just so that your testimony is clear, was it your testimony that these other teachers did not have the level of classroom management difficulties that Mr. Harper had?
> A: Correct.

Principal Nicholson provided similar testimony:

> Q: Did the other sixth grade teachers have the – teach the same students that Mr. Harper taught?
> A: Yes.
> . . . .
> Q: Did the other teachers, sixth grade teachers have the classroom management issues or problems that Mr. Harper had?
> A: Not so much that I – not at all really.

[9] "The very definition of inefficiency included in the statute uses the plural term 'evaluations' rather than the singular 'evaluation'." *Harrison v. Shelby Cty. Bd. of Educ.*, No. W2015-01543-COA-R3-CV, 2016 WL 1250782, at *4 (Tenn. Ct. App. Mar. 30, 2016). When the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application. *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn. 2004). Accordingly, together, section 49-5-501(6) of the Tenure Act and

that the 2007-2008 and 2008-2009 evaluations were satisfactory because they were marked so on their face, we find it unnecessary to address this issue considering there is already sufficient independent evidence to sustain Mr. Harper's dismissal on the basis of inefficiency.

## B. Incompetence

Tennessee Code Annotated section 49-5-501 defines "incompetence" as follows:

> "Incompetence" means being incapable, lacking adequate power, capacity or ability to carry out the duties and responsibilities of the position. This may apply to physical, mental, educational, emotional or other personal conditions. It may include lack of training or experience, evident unfitness for service, a physical, mental or emotional condition making the teacher unfit to instruct or associate with children or the inability to command respect from subordinates or to secure cooperation of those with whom the teacher must work;

Tenn. Code Ann. § 49-5-501(5). The chancery court, relying on the same evidentiary basis on which it sustained Mr. Harper's dismissal on the basis of inefficiency, also sustained his dismissal on the basis of incompetence. The chancery court found that Mr. Harper's "continued lack of classroom management is equivalent to an 'inability to command respect or secure cooperation' of his students and therefore, renders him incapable or unable to carry out the duties and responsibilities of a teacher." Based on our review of the record on appeal, we agree with the findings of the trial court.

As discussed in the previous section, we concluded that the evidence of Mr. Harper's continued lack of classroom management was sufficient to sustain Mr. Harper's dismissal on the basis of inefficiency. We further conclude that the same evidence offered to prove Mr. Harper's inefficiency is sufficient to prove his incompetency. Just as Mr. Harper's lack of classroom management demonstrated a "wanting in effective performance of duties" and was "below the standards of efficiency," it also demonstrated that Mr. Harper "lack[ed] adequate power . . . to carry out the duties and responsibilities of the position." *See* Tenn. Code Ann. §§ 49-5-501(5)-(6). Mr. Harper's "lack of power" is evidenced by the fact that he had to use a whistle to "bring the classroom back to order." Mr. Ryan testified that Mr. Harper's use of a whistle "was really a concern" and "totally out of line and unacceptable in a classroom[,]" noting that, in his teaching experience, whistles are supposed to be used only in gym classes. Additionally, both Principal Nicholson and Mr. Ryan testified as to the complete lack of respect for Mr. Harper's authority that students exhibited in his classroom.

---

*Harrison* indicate that evidence of more than one unsatisfactory evaluation is *one* way to show that a teacher is inefficient.

In *Childs v. Roane County Board of Education*, this Court affirmed a tenured teacher's dismissal for incompetence by noting that the record was "replete with testimony that plaintiff was unable to control her classroom, maintained questionable methods for determining students' grades, and required extraordinary assistance from school administrators and parents to enforce discipline." *Childs v. Roane Cty. Bd. of Educ.*, 929 S.W.2d 364, 365 (Tenn. Ct. App. 1996). Similarly, here, the record is replete with proof that Mr. Harper was unable to control his classroom and that he required extraordinary assistance from school administrators. Regarding the latter, the record indicates that Mr. Harper called the front office for assistance two to three times a week, which, according to Mr. Ryan, was excessive in comparison to the other teachers at the school. Principal Nicholson testified that she, too, was concerned with the frequency at which Mr. Harper called the front office for assistance.

We agree that each of these factual circumstances reflect directly on Mr. Harper's competency as a teacher and, accordingly, affirm the chancery court's finding that there is sufficient evidence to sustain Mr. Harper's dismissal on the basis of incompetency.

## C. Neglect of Duty

Tennessee Code Annotated section 49-5-501 defines "neglect of duty" as "gross or repeated failure to perform duties and responsibilities that reasonably can be expected of one in such capacity or continued unexcused or unnecessary absence from duty." *Id.* at § 49-5-501(8). The chancery court found sufficient evidence to sustain Mr. Harper's dismissal on the basis of neglect of duty, citing to his excessive tardiness, his repeated failure to timely submit his leave paperwork during the 2009-2010 school year, and his failure to attend required professional development courses at the University of Memphis.[10]

Regarding his incidents of tardiness, Mr. Harper's performance evaluations indicate that he was tardy 42 times during the 2007-2008 school year and 91 times during the 2008-2009 school year. Additionally, the February 26, 2013 notice of charges letter indicates that, during the 2011-2012 school year, Mr. Harper was tardy 35 times. Mr. Harper, however, disputes these numbers. Regarding his alleged tardiness for the 2007-2008 and 2008-2009 school years, Mr. Harper testified that the machine that tallied attendance would break down "quite often." He also testified that he was never disciplined for his alleged tardiness during these two school years. As to his alleged tardiness for the 2011-2012 school year, Mr. Harper provided the following testimony:

Q: Now, the charging letter also indicates that you were tardy 35 times during the 2011-2012 school year. Were you, in fact, tardy 35 times?

___

[10] The trial court also found that Mr. Harper engaged in neglect of duty "for the same reasons discussed above in regard to [Mr. Harper's] inefficiency and incompetency."

A: I seriously doubt it.  I am not saying that I was never ever late, and I do recall calling in a couple times, but at the same time, if I'm doing metal detector duty and I'm also getting in there and the computer that you check in on is not working or there's a line, all those factors come into play.

Numerous teachers support Mr. Harper's claim that, when there was a long line at the metal detector or a shortage of teachers, Mr. Harper would "step up" and work metal detector duty.  In addition to Mr. Harper's claims that he worked extra metal detector duty and that the check-in system did not work properly at times, there is no other evidence supporting the charge that Mr. Harper was tardy 35 times.  Mr. Harper testified that he never received an "oops" memo or any other warning regarding his alleged tardiness during the 2011-2012 school year, whereas other teachers who were tardy did receive such memos.[11]  We conclude that the chancery court erred in finding that there was sufficient evidence to sustain Mr. Harper's dismissal on the basis of neglect of duty due to his alleged tardiness.

Regarding Mr. Harper's failure to timely submit his leave-extension paperwork and return from leave during the 2009-2010 school year, we are of the opinion that, had SCBE acted timely, Mr. Harper's admitted "slight misstep" would be sufficient to constitute neglect of duty.  Indeed, the Tennessee Supreme Court has noted that "a teacher's failure to return from leave may be considered cause for termination because it is 'neglect of duty[.]'" *Thompson v. Memphis City Bd. of Educ.*, 395 S.W.3d 616, 626 (Tenn. 2012).  However, Mr. Harper's failure occurred in 2010—three years prior to when SCBE brought tenure charges against him.  Under these facts, we conclude that the chancery court erred in finding that Mr. Harper's failure to submit his leave-extension paperwork in a timely manner constituted neglect of duty.  We are also of the opinion that Mr. Harper's failure to attend a professional development course was an insufficient basis to support a finding of neglect of duty in this case.  The record indicates that Mr. Harper was scheduled to attend a professional development course on classroom management at the University of Memphis on February 25, 2012.  Mr. Harper, however, testified that he was ill that day and "had some kind of medical appointment that I had to get to."  Moreover, Mr. Harper testified that he was not given an opportunity to make up the training.  We conclude that the chancery court erred in finding that Mr. Harper's failure to attend the professional development course constituted neglect of duty.

## D.  Professional Development Plan

As this Court stated in *Harrison*, "MCS Professional Development Policy 5.8034 was the governing authority regarding professional development within the school district[,]" which "required the development of an individual professional development plan prior to termination of a tenured teacher." *Harrison*, 2016 WL 1250782, at *5.  The

---

[11] "Oops" memos were a form of discipline issued to teachers who were tardy.

chancery court found that SCBE provided a professional development plan to Mr. Harper in compliance with MCS Professional Development Policy 5.8034. On appeal, Mr. Harper argues that SCBE failed to follow this policy.

Mr. Harper argues that the facts of this case are analogous to those of *Harrison*, where this Court concluded that SCBE did not develop or implement an individual professional development plan for Ms. Harrison as required by MCS Professional Development Policy 5.8034. *Harrison*, 2016 WL 1250782, at *6. While this case does bear some resemblances to *Harrison*, we are of the opinion that they are ultimately distinguishable.

In *Harrison,* Ms. Harrison was observed on four separate occasions throughout the school year. *Id*. at *4. Three of the post-observation reports noted that Ms. Harrison had classroom management issues, but, as this Court noted, "only one of the four post-observation reports entered into evidence suggested professional development for Ms. Harrison" and "three of the four post-observation reports did not detail any areas of growth or list any additional considerations for Ms. Harrison." *Id*. Here, Mr. Harper, too, was observed on four separate occasions throughout the 2011-2012 school year; however, all four of the post-observation reports entered into evidence in the present case detailed areas of growth and listed additional considerations for Mr. Harper, and two of the four suggested professional development for Mr. Harper. Moreover, this Court in *Harrison* concluded that the single professional development plan developed for Ms. Harrison did not comply with MCS Professional Development Policy 5.8034 because

> Mr. Kyle [the principal] did not recommend specific professional development to Ms. Harrison. The professional growth plan submitted by Mr. Kyle contains only boiler-plate catch-phrases about types of support available throughout the district. The plan submitted into evidence is not individualized to Ms. Harrison. Additionally, the plan is not signed by Mr. Kyle, nor did he explain the omission of his signature during his testimony.

*Id*. Here, the record indicates that the school administrators at Cypress Middle School did recommend specific and individualized professional development to Mr. Harper. In the professional development plan attached to the November 4, 2011 post-observation report, Mr. Harper was given, among other things, the following goals: develop interactive lessons involving games in order to sustain students' attention specific for sixth grade science; read a book on whole brain strategies and activities; attend a Science Teacher's Collaborative on January 25, 2012 at East High School; and develop and implement a rules and procedures system to better facilitate classroom management. In the professional development plan attached to the February 24, 2012 post-observation report, Mr. Harper was instructed, among other things, to develop and implement strategies to cultivate a learning environment specifically for a science class, such as incorporating a lab lesson once a week, and to attend a professional development course

titled "Science: Conducting Effective Labs and Hand-on Experiments for grades 6-8". These goals and instructions provided by the professional development plans are specific and individualized to Mr. Harper, who at the time was teaching sixth grade science. Moreover, Principal Nicholson provided additional professional development to Mr. Harper by arranging for him to observe a "Level 5" science teacher at Lester Middle School in January 2012.[12] Mr. Ryan and Principal Nicholson testified similarly as to the purpose of Mr. Harper's observation. Mr. Ryan stated that the administrators at Cypress Middle School "wanted him to have the opportunity to see some good[,] strong science teachers in action." Principal Nicholson added that she hoped Mr. Harper "could come back and implement some of the strategies [he observed at Lester] within his classroom[.]".

Mr. Harper correctly notes that neither of the professional development plans was signed by school administrators. These omissions, however, can be clarified by additional documents in the record. All four post-observation reports are signed by either Principal Nicholson and Mr. Harper or Mr. Ryan and Mr. Harper. Additionally, the post-observation reports contain a section titled "Professional Growth Review," which asks the parties to select certain indicators from the "Professional Growth and Support Plan." The two professional development plans submitted into evidence—while not signed or dated—immediately follow the November 4, 2011 and February 24, 2012 post-observation reports—which were signed and dated by both Principal Nicholson and Mr. Harper. Accordingly, it appears that the two professional development plans were developed in conjunction with the respective post-observation reports. Even disregarding such reasoning, the fact that the two professional development plans lack signatures from school administrators, by itself, is insufficient to support a conclusion that SCBE did not comply with MCS Professional Development Policy 5.8034. In *Harrison*, aside from the fact that the plan was not signed, we held that the professional development plan submitted into evidence did not comply with MCS Professional Development Policy 5.8034 because: (1) it did not recommend specific professional development to Ms. Harrison; (2) it contained only boiler-plate catch-phrases about types of support available throughout the district; and (3) it was not individualized to Ms. Harrison. *Harrison*, 2016 WL 1250782, at *4. Here, the two professional development plans were individualized to and recommended specific professional development for Mr. Harper. Additionally, whereas Ms. Harrison was informed of types of support available throughout the school district, Mr. Harper was actually required to meet with and observe a Level 5 science teacher at Lester Middle School. We conclude that Mr. Harper was offered sufficient professional development and affirm the chancery court's finding that SCBE provided a professional development plan to Mr. Harper in compliance with MCS Professional Development Policy 5.8034.

---

[12] According to Mr. Ryan, Lester Middle School is a "neighboring middle school, not far from Cypress[,]" noting that "what's unique about Lester is that their kids share very similar challenges to our kids at Cypress."

## CONCLUSION

For the foregoing reasons, we reverse the chancery court's finding that Mr. Harper engaged in neglect of duty, but we affirm the chancery court's findings that Mr. Harper's lack of classroom management constituted sufficient evidence of inefficiency and incompetence and thereby affirm the teacher's termination.

_____
ARNOLD B. GOLDIN, JUDGE